**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| RICKY ALLEN FROSCH, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | CASE NO. 6:22-CV-00236-JCB-KNM |
| COLTON ALSOBROOK, et al., | § | |
| | § | |
| *Defendants.* | § | |
| | § | |
| | § | |

**REPORT AND RECOMMENDATION OF
THE UNITED STATES MAGISTRATE JUDGE**

Before the Court is Defendants' Motion for Summary Judgment on the Issue of Qualified Immunity. Doc. 75. The Court has considered Defendants' Motion for Summary Judgment, Plaintiff's Response (Doc. 84), Defendants' Reply (Doc. 85), and the supplemental briefing filed by both parties. A hearing on the motion was held on May 6, 2024. Doc. 93. The Court recommends Defendants' Motion for Summary Judgment (Doc. 75) be **GRANTED in part and DENIED in part.**

**BACKGROUND**

Plaintiff Ricky Frosch brings claims concerning events that occurred while he was incarcerated at the Henderson County Jail as a pretrial detainee. Frosch's claims arise from a use of force against him upon his arrival at the jail as well as his placement in a suicide prevention cell (also referred to as a "violent cell"). Frosch's claims are brought against Henderson County (the county in charge of the jail), as well as correctional officers Colton Alsobrook, Gerald Mickey,

1

Morgan Fain, Brigan Johnston, and Kalynn Matich.[1] Frosch brings claims under Section 1983 for unlawful use of force (or, in the alternative, unlawful seizure) and a claim for deprivation of basic human needs.[2] The individual officer Defendants assert qualified immunity and move for summary judgment on the claims for excessive force and deprivation of basic human needs (Counts One, Two, and Three).[3]

## I.      Evidentiary Objections

The Court will first address the Defendants' objections to Frosch's summary judgment evidence. Defendants argue the Court may not consider Frosch's exhibits A and K as proper summary judgment evidence.[4] Exhibit A is Frosch's declaration.[5] Exhibit K is a business records affidavit of the custodian of records for the Terrell State Hospital.[6] Defendants object to Frosch's declaration on the grounds that it is barred by the sham-affidavit doctrine and it was not disclosed during discovery.[7] Defendants object to the business records affidavit because neither it nor the custodian or records for Terrell State Hospital were disclosed during discovery.[8]

### A.      Sham-affidavit doctrine

"In considering a motion for summary judgment, a district court must consider all the evidence before it and cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier deposition." *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 893 (5th Cir. 1980). However, under the sham-affidavit doctrine, a party cannot "defeat a motion for summary

---

[1] Doc. 30 at 3. All claims against defendant Kalynn Matich have since been dismissed with prejudice pursuant to a motion jointly filed by the parties. Doc. 86.
[2] Doc. 30.
[3] Doc. 75.
[4] Doc. 84. Defendants also object to Plaintiff's Exhibit N, but the Court will not address Defendants' objection to exhibit N at this juncture because the Court does not rely on it in this Report.
[5] Doc. 82-2.
[6] Doc. 82-10.
[7] Doc. 84 at 1.
[8] Doc. 84 at 4.

judgment using an affidavit that impeaches, without explanation, sworn testimony." *Seigler v. Wal-Mart Stores Texas, L.L.C.*, 30 F.4th 472, 477 (5th Cir. 2022) (internal quotation marks and citation omitted). "[T]he bar for applying the doctrine is a high one, typically requiring affidavit testimony that is inherently inconsistent with prior testimony." *Id*. (internal quotation marks and citation omitted). The doctrine does not apply when an affidavit "supplements rather than contradicts" the prior deposition testimony. *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 496 (5th Cir. 1996).

Defendants assert that Frosch's declaration violates the sham-affidavit doctrine because it is "inherently inconsistent" with his deposition testimony.[9] They identify two categories of statements that they contend inexplicably contradict Frosch's previous deposition testimony: (1) statements pertaining to whether Frosch expressed an intent to harm himself; and (2) statements asserting that—once at the jail—Frosch did not threaten to kill officers or resist them.

### 1.    Frosch's suicidal comments

Defendants first argue that paragraph three of Frosch's declaration violates the sham-affidavit doctrine.[10] It reads as follows: "I never made any comments expressing an intent to harm myself to any sheriff's deputies during the course of my arrest and transport to the jail on June 21, 2021."[11] Defendants argue that this statement violates the sham-affidavit doctrine because in his deposition Frosch testified that he did not remember any of the booking questions he was asked once inside the jail.[12]

In response, Frosch states that these two statements are not contradictory. He argues that his deposition testimony does not contradict his assertion that he did not make suicidal comments

---

[9] Doc. 84 at 3.
[10] Doc. 84 at 3.
[11] Doc. 82-2 at ¶ 3.
[12] Doc. 82 at 3; Doc. 75-3 at 34.

to sheriff's deputies *during his arrest and transport*.[13] The Court agrees. Frosch's arrest and transport to the jail constitutes a separate event from Frosch's booking once inside the jail. Therefore, these statements are not inherently contradictory. Defendants' objection to this paragraph is overruled.

### 2.    Frosch's compliance with officers at the jail

Defendants also argue that paragraphs four through six of Frosch's declaration violate the sham-affidavit doctrine.[14] This portion of the declaration states as follows:

> 4. After I was transported to the Henderson County Jail, I was fully compliant with all instructions and commands I was given by officers.
>
> 5. I never threatened to kill or harm anyone at the jail, including Mr. Alsobrook or any other correctional officers.
>
> 6. I did not resist any correctional officers in any way. I also did not resist any sheriff's deputies as they were transferring me into the custody of the jail.[15]

During his deposition, Frosch admitted that he threatened to murder the officer who was transporting him as they were in the patrol vehicle driving up to the jail.[16] Therefore, Defendants state that it is inherently inconsistent for Frosch to now say he "never threatened to kill or harm anyone at the jail."[17] However, according to Frosch, paragraph five of the declaration refers to the time period *after* Frosch's car ride to the jail.[18] The preceding paragraph begins with the phrase "[a]fter I was transported to the Henderson County Jail . . . ."[19] The declaration is consistent with Frosch's deposition testimony when read in this light.

---

[13] Doc. 87 at 2.
[14] Doc. 84 at 3.
[15] Doc. 82-2.
[16] Doc. 75-3 at 16.
[17] Doc. 84 at 3.
[18] Doc. 87 at 3.
[19] Doc. 87 at 3.

Turning to the next alleged discrepancy, Defendants argue that the declaration violates the sham-affidavit doctrine because "[Frosch] testified in his deposition that he could not remember anything he said before force was used against him."[20] As support for this assertion, Defendants cite the following deposition testimony:

> Q: So, you don't remember what you were saying before they put you against the wall physically.

> A: They had just took my boots off and they had offered me those little orange shoes and I had told them they wasn't going to fit me and then he said turn around and face the wall. And I don't know what remarks I was making, but I turned around and faced the wall.

> Q: Were you still upset?

> A: Well, yes, I was upset, of course.[21]

Frosch argues that his declaration is not inherently inconsistent with his deposition testimony for three reasons. First, Frosch states his testimony that he did not "know what remarks [he] was making" refers only to the brief moment in time before he was placed against the wall; this testimony does not mean he cannot remember anything at all that he said before force was used against him.[22] Second, Frosch points out that he did in fact appear to "know what remarks [he] was making" because he testified that, before being placed against the wall, he "told them [those little orange shoes] wasn't going to fit me." Lastly, Frosch argues that the question asked of him in the deposition was vague. The question posed was "[s]o, you don't remember what you were saying before they put you against the wall physically."[23]

The Court agrees with Frosch that the line of questioning on this topic at the deposition was not entirely clear or unambiguous, and that Frosch's deposition testimony applies to a brief

---

[20] Doc. 84 at 3.
[21] Doc. 75-3 at pp. 23–24.
[22] Doc. 87 at 4.
[23] Doc. 87 at 5; Doc. 75-3 at 23.

moment in time. The Defendants have not pointed to, and the Court cannot find, any point in the deposition when Frosch was asked whether he threatened to kill or harm anyone once at the jail. The statement that Frosch did not threaten to kill or harm someone at the jail is therefore not "so markedly inconsistent with a prior statement as to constitute an obvious sham."[24] This is an instance where Frosch's declaration testimony constitutes a more expansive statement that clarifies, rather than conflicts with, prior testimony.

Frosch also testified that he "[had] no idea what [he] was saying" when he exited the vehicle at the jail. The relevant portion of the deposition transcript reads as follows:

Q: So, it's not an easy thing to maneuver out of the car, right?

A: Yes.

Q: Do you know how many people were around the door when the door was opened?

A: No, I don't. I don't know. I mean, they just opened the door, and I got out.

Q: Do you remember saying anything when you got out?

A: I have no idea what I was saying.[25]

Again, the Court finds that Frosch's declaration supplements (as opposed to contradicts) this deposition testimony. Frosch was asked whether he remembered saying anything when he was getting out of the car. Frosch was not asked whether he threatened to kill or harm anyone at the jail.

---

[24] To support their assertion that Plaintiff "cannot contradict the evidence that he threatened to kill the officers, was not compliant, and did not resist them," Defendants also cite to "Ex. A, Frosch Dep. 110:17-21." However, page 110 of Frosch's deposition contains testimony regarding how often Plaintiff was given Tylenol in the infirmary—a topic not at all related to the objected-to declaration.

[25] Doc. 82-4 at 5.

Lastly, the Court notes that Frosch's testimony that he was fully compliant and did not resist is supported by various portions of his deposition testimony.[26] Any discrepancies between Frosch's deposition and declaration may call his credibility into question, but the Court does not think they rise to the level of an inherent inconsistency. *See Seigler*, 30 F.4th at 477 (citing *Winzer v. Kaufman Cty.*, 916 F.3d 464, 473 (5th Cir. 2019). Defendants' objection to paragraphs four through six is overruled.

### B.    Failure to disclose exhibits A and K

Federal Rule of Civil Procedure 37 states that, in the case of untimely or insufficient disclosure by a party, "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). When determining whether substantial justification or harm exists, courts consider "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." *Texas A&M Rsch. Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003).

Defendants object to Frosch's declaration (exhibit A) and the Terrell State Hospital affidavit (exhibit K) on the grounds that the declaration, the affidavit, and the custodian of records for the Terrell State Hospital were not disclosed in discovery.[27] In response, Frosch states that his declaration did not exist in its final form until one day before his Response to Defendants' Motion for Summary Judgment was filed.[28] The declaration was created for the purpose of opposing

---

[26] Doc. 75-3 at 22 (Plaintiff explaining that "[w]hen they told me to turn around and face the wall, you know, I turned around and faced the wall."); Doc. 82-4 at 7 (". . . then he said turn around and face the wall. And I don't know what remarks I was making, but I turned around and faced the wall.").
[27] Doc. 84 at 1.
[28] Doc. 87 at 6.

Defendants' motion and did not exist prior to the expiration of the discovery deadline. Additionally, Defendants had the opportunity to depose Frosch at length.

"Courts considering this issue have found that declarations and affidavits appearing to have been created for summary judgment purposes are not required to be disclosed during discovery (as they likely did not exist then)." *Cortes-Castillo v. One Time Constr. Texas LLC*, No. 3:21-CV-2093, 2022 WL 4281601, at *2 (N.D. Tex. Sept. 15, 2022) (internal quotation marks and citation omitted) (compiling cases). The objection to Frosch's declaration on the ground that it was not disclosed is overruled.

Defendants also object to the affidavit of the custodian of records for Terrell State Hospital on the grounds that neither the affidavit nor the custodian of records were disclosed.[29] Before addressing the merits of this objection, the Court will explain the role of this affidavit in Frosch's Response to the Motion for Summary Judgment.

Defendants state that Frosch told his booking officer that he had received mental health treatment at Terrell State Hospital.[30] According to Defendants, this is one of Frosch's "many statements . . . that led the officers to believe he was suicidal."[31] Frosch denies that he ever received treatment at Terrell State Hospital and denies that he ever stated as much to any jailers.[32] He notes that "[t]he custodian of records for Terrell State Hospital was unable to locate any records showing that Frosch had ever been treated there" and cites to the custodian of record's affidavit as support for this assertion.[33]

---

[29] Doc. 84 at 4.
[30] Doc. 75 at 23.
[31] Doc. 75 at 22.
[32] Doc. 82 at 23.
[33] Doc. 82 at 23.

Defendants do not show how they were specifically prejudiced by the failure to disclose the affidavit of the custodian of records beyond the assertion that Frosch "uses this document to bolster his argument that they should be subjected to the time and expense of a trial."[34] On the other hand, Frosch argues that the failure to disclose was harmless because earlier disclosure of the affidavit would have made no practical difference.[35]

The Court agrees with Frosch. "The focus of [the] inquiry is whether [the movant] was prejudiced by [the non-movant's] failure to comply with discovery rules." *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 564. In this case, Frosch's failure to disclose was harmless.

This evidence is important: Frosch relies on it to help dispute Defendants' assertion that Frosch was suicidal. Furthermore, any prejudice to defendants is slight. The custodian's affidavit consists of only one statement: "no records found."[36] Therefore, as Frosch notes, deposing the custodian of records would be pointless. Defendants have had an adequate opportunity to respond to the affidavit in their Reply, in their supplemental briefing, and at the hearing held on the motion for summary judgment, thus minimizing any prejudice. As Frosch points out, Defendants' own record lists Terrell State Hospital as Frosch's past medical provider.[37] Since the prejudice is minimal, the third factor—availability of a continuance to cure the prejudice—does not affect the outcome. Defendants have not requested that the Court reopen or extend discovery to depose the custodian of records. As to factor four, Frosch states his failure to disclose the affidavit earlier was inadvertent and was because he received the affidavit after Defendants had already filed their motion for summary judgment.[38]

---

[34] Doc. 84 at 4.
[35] Doc. 87 at 9.
[36] Doc. 82-10.
[37] Doc. 87 at 9.
[38] Doc. 87 at 9.

Together, these factors weigh in favor of overruling Defendants' objection to the Terrell State Hospital custodian of records affidavit. *See Snowman v. IMCO Recycling, Inc.,* 347 F. Supp. 2d 338, 346 (N.D. Tex. 2004) (declining to strike summary judgment affidavit where court observed that objecting party had not shown prejudice and that objecting party had sufficient notice of non-disclosed affiant's role through exchange of documents produced in discovery).

## II.    Factual Background

Having clarified the evidence it may consider, the Court will now provide a summary of the facts relevant to this dispute.[39]

### A.    Frosch's arrest and Alsobrook's use of force

On June 21, 2021, Henderson County Sherriff's Deputies arrested Frosch after being called to his home in response to a domestic disturbance.[40] During the course of his arrest, Frosch kicked one deputy in the legs and head-butted another in the face.[41] Frosch head-butted a deputy once more while being placed in the patrol vehicle that would transport him to Henderson County Jail.[42] As the patrol vehicle pulled up to the Henderson County Jail, Frosch told the deputy who was driving, "I'll kill you next time you come to my house without knocking."[43] Frosch was charged with—and pleaded guilty to—the felony offense of assault on a public servant based on his conduct during arrest.[44]

---

[39] Unless otherwise noted, the facts are undisputed. When disputed, the facts are viewed in the light most favorable to the non-moving party, Frosch. *See, e.g. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When citing to the page numbers of a document in the record, the Court cites to the page numbering of the Court's internal CM/ECF docket system.

[40] Doc. 75 at 13; Doc. 75-7. Defendants submitted video evidence of Frosch's arrest and transport to the jail. Doc. 75-8; 75-9; 75-10; 75-11. Frosch argues that the events surrounding his initial arrest are entirely irrelevant to the claims before the Court. Doc. 82 at 9. The Court summarizes the events of Frosch's arrest because one of Defendant Alsobrook's arguments is that his use of force was objectively reasonable because he was "on heightened alert that Plaintiff had been violent toward officers immediately before [Alsobrook] encountered him." Doc. 75 at 29–30.

[41] Doc. 75 at 13; Doc. 75-7; Doc. 75-11 (Bates 00005, 19:00-20:30).

[42] Doc. 75 at 13; Doc. 75-7; Doc. 75-11 (Bates 00005, 23:30-24:00).

[43] Doc. 75 at 14; Doc. 75-10 (Bates 00004, 6:35-6:46).

[44] Doc. 75 at 14; Doc. 75-7 at 65.

Prior to Frosch's arrival at the jail, dispatch officers called jail staff and notified them that they were transporting a "combative" inmate.[45] Defendant Alsobrook was one of the jailers who reported to the sallyport (a secured garage attached to the jail) to help remove Frosch from the patrol vehicle.[46] Alsobrook testified that before the jailers removed Frosch from the patrol vehicle, the deputy who transported Frosch gave the jailers a "rundown" of Frosch's combative and threatening behavior.[47]

The parties offer contradictory accounts of what happened once Frosch arrived at the jail. The video footage of Frosch's arrest that was provided to the Court ends upon the patrol vehicle's arrival. There is no video evidence in the summary judgment record of the use of force. Alsobrook states that once the patrol vehicle's door opened, Frosch started yelling and threatening to kill officers.[48] According to Alsobrook, Frosch "would not exit the vehicle under his own will."[49] Alsobrook brought Frosch into the vestibule (a small area connecting the sallyport to the booking area) so he could be searched.[50] His breath smelled of alcohol.[51] Alsobrook at this point verbally ordered Frosch to turn around and face the wall.[52] According to Alsobrook, Frosch refused to follow his orders to face the wall.[53] Therefore, Alsobrook "gently placed [his] hands on [Frosch's] shoulders and turned him around and held him against the wall, using very minimal force" while

---

[45] Doc. 75 at 15; Doc. 75-1 at 9.
[46] Doc. 75 at 15; Doc. 75-1 at 10.
[47] Doc. 75 at 15; Doc. 75-1 at 10.
[48] Doc. 75 at 16; Doc. 75-1 at 11.
[49] Doc. 75 at 16; Doc. 75-1 at 11.
[50] Doc. 75 at 16; Doc. 75-1 at 12.
[51] Doc. 75 at 29; Doc. 75-1 at 12.
[52] Doc. 75 at 17; Doc. 75-1 at 12–13.
[53] Doc. 75-1 at 14; Doc. 82-3.

another officer searched him.[54] Alsobrook stated that while being searched, Frosch threatened to murder officers.[55] He was "continuously pulling away" and "pushing off the wall."[56]

Next, Frosch and the jailers left the vestibule and traveled to the jail's intake area. Alsobrook testified that at this point "[Frosch] was digging his heels into the ground, refusing to walk forward, and wasn't allowing us to escort him forward."[57] Alsobrook testified that Frosch also was verbally threatening people.[58] Therefore, Alsobrook states that he placed his right arm over Frosch's right shoulder and used his weight to pull Frosch to the ground.[59]

Incident reports regarding the use of force that were written by Alsobrook and another on-duty officer do not mention that Frosch was making any threats to kill officers.[60] They do describe that Frosch was "yelling at officers," was "pulling away," and was "refusing to follow verbal commands."[61] Officer Johnson, who was on duty in the booking area at the time of the use of force, testified that Frosch was "combative and loud, to say the least."[62] He testified that he couldn't remember the exact comments Frosch had made, but he "just [remembered] hearing yelling and him—it—it was more like standoffish, like get-off-me type . . ."[63]

Frosch offers a different version of events. Frosch states in his declaration that after he was transported to the jail, he was "fully compliant with all instructions and commands" given by officers.[64] According to Frosch, he never threatened to harm or kill anyone at the jail, and he did

---

[54] Doc. 75-1 at 13.
[55] Doc. 75 at 17; Doc. 75-1 at 42–43.
[56] Doc. 75-1 at 17; Doc. 75-1 at 14.
[57] Doc. 75-1 at 16.
[58] Doc. 75-1 at 17.
[59] Doc. 75 at 18; Doc. 75-1 at 15.
[60] Doc. 82-3 at 7–8.
[61] Doc. 82-3 at 7–8.
[62] Doc. 82-8 at 12.
[63] Doc. 82-8 at 12–13.
[64] Doc. 82-2 at ¶ 4.

not resist the correctional officers in any way.[65] Frosch testified in his deposition that when Alsobrook said turn around and face the wall, he "[did not] know what remarks [he] was making, but [he] turned around and faced the wall."[66] While up against the wall in the vestibule, he states his hands were twisted behind his back and his head was "mashed" against the wall, which "busted his head open."[67] He describes the following experience: "I couldn't breathe and I was trying to gasp for air and then just I could taste metal in my mouth and it sounded like a train was coming and the lights went out and I was out."[68] Frosch states that when he awoke he was laying on the ground of the intake area.[69]

Frosch sustained a laceration on his head that required stitches and a broken collarbone because of the use of force.[70] The parties do not dispute that Frosch was handcuffed at all relevant times. Alsobrook testified that Frosch did not attempt to headbutt or kick any officer once at the jail.[71] An incident report written by an officer who observed the use of force describes it as "Cpl. Alsobrook [picking up] inmate Frosch and [slamming] him into the ground to gain compliance."[72]

**B.     Conditions in the violent cell**

The second alleged constitutional violation at issue in this case is Frosch's placement in a suicide-prevention cell that is also known as the "violent cell." Frosch was housed in the violent cell for two days.[73] The violent cell is covered in foam padding.[74] Inmates housed in the violent cell are not provided with a mattress or pillow; they sleep on a padded bench that is roughly two

---

[65] Doc. 82-2 at ¶ 5-6.
[66] Doc. 82-4 at 7.
[67] Doc. 82-4 at 7.
[68] Doc. 82-4 at 7.
[69] Doc. 82-4 at 8.
[70] Doc. 75 at 18; Doc. 75-1 at 38; Doc. 75-1 at 19; Doc. 75-7 at 40.
[71] Doc. 82 at 14; Doc. 82-5 at 5.
[72] Doc. 82 at 10; Doc. 82-3 at 8.
[73] Doc. 75 at 25; Doc. 75-3 at 39.
[74] Doc. 75 at 20; Doc. 75-5 at 7.

inches from the floor.[75] They are provided with a small blanket called a "suicide blanket."[76] A suicidal inmate's clothing is removed before being placed in the violent cell.[77] The inmates in the violent cell do not have access to running water—there is no toilet or sink.[78] Inmates use a grate-covered hole in the floor to relieve themselves in lieu of a toilet.[79] They are not given toothbrushes and are provided with only a few sheets of toilet paper upon request.[80] The lights are normally kept on at all hours, although the officers assigned to guard the violent cell (the "central officers") have the discretion to turn off the lights at night.[81] Officers check on the inmates every ten minutes.[82] The central officer defendants in this case testified that inmates are generally offered water every two hours, or when they request it.[83]

### C.    Frosch's placement in the violent cell

Defendants assert that Frosch was placed in the violent cell because he repeatedly threatened suicide—not because he was violent.[84] Frosch, on the other hand, claims that he never made any "suicidal comments" and that he was housed in the violent cell as punishment.[85] The Court will describe the parties' competing narratives below.

Alsobrook states that the sheriff's deputy who transported Frosch to the jail told him that Frosch had made suicidal comments during his arrest.[86] Alsobrook asserts that once this information was relayed to jail staff, the staff had an obligation to place Frosch in the violent cell.[87]

---

[75] Doc. 75 at 20; Doc. 75-5 at 8.
[76] Doc. 82-2 at ¶ 15.
[77] Doc. 75 at 20; Doc. 75-4 at 7.
[78] Doc. 75 at 20; Doc. 75-2 at 31.
[79] Doc. 75 at 20; Doc. 75-4 at 7.
[80] Doc. 75 at 21; Doc. 75-4 at 16; Doc. 75-4 at 20.
[81] Doc. 82 at 26; Doc. 82-7 at 8.
[82] Doc. 75 at 21; Doc. 75-5 at 18.
[83] Doc. 75 at 21; Doc. 75-5 at 14; Doc. 75-4 at 27.
[84] Doc. 75 at 20 n.13.
[85] Doc. 82 at 6-7; Doc. 82 at 22.
[86] Doc. 75 at 15; Doc. 75-1 at 10.
[87] Doc. 75-1 at 34.

According to Alsobrook, those were not the only suicidal comments Frosch made. After the use of force occurred, Alsobrook took Frosch to the hospital to have the injuries to his collarbone and head examined.[88] Alsobrook asserts that during the hospital trip, Frosch threatened to kill himself in Alsobrook's presence.[89] On the way back to the jail from the hospital, Alsobrook sent a text message to two of his coworkers that states, "Well I know he was heading there already but he's definitely going to have to be in violent. Just made suicidal comments."[90]

When Frosch and Alsobrook returned from the hospital, Alsobrook turned Frosch over to a different officer to complete the intake process. As part of this process, Frosch was asked standard questions from a form promulgated by the Texas Commission on Jail Standards that screens for suicide risk.[91] The form notes that Frosch answered "yes" to the question, "Are you thinking of killing or injuring yourself today? If so, how?" and "yes" to the question, "Have you ever attempted suicide? If so, when and how?"[92] According to the form, Frosch would not say when he was thinking of killing himself and he would not say how he had previously attempted suicide.[93] The form states that prior to Frosch's arrest he felt "down, depressed, or [had] little interest or pleasure in doing things," and that he answered "yes" to the question, "Do you have nightmares, flashbacks, or repeated thoughts or feelings related to PTSD or something terrible from your past?"[94] The form also states that Frosch had been previously diagnosed with paranoid schizophrenia and received mental health services at Terrell State Hospital.[95]

---

[88] Doc. 75 at 18; Doc. 75-3 at 28.
[89] Doc. 75 at 18; Doc. 75-1 at 43.
[90] Doc. 82 at 22; Doc. 82-12 at 2.
[91] Doc. 75 at 19; Doc. 75-4 at 5; Doc. 75-7 at 40.
[92] Doc. 75-7 at 40.
[93] Doc. 75-7 at 40.
[94] Doc. 75-7 at 40.
[95] Doc. 75-7 at 40.

According to Frosch, the "suicidal comments" were fabricated as pretext to place him in the violent cell.[96] Frosch states that he "never made any comments expressing an intent to harm [himself] to any sheriff's deputies during the course of [his] arrest and transport to the jail."[97] There is a video recording of Frosch's arrest and transport, and Frosch points out that he cannot be heard making any suicidal comments in the video.[98] Frosch notes that the form that screens for suicide risk was filled out after it had already been predetermined that Frosch would be housed in the violent cell.[99]

In his declaration, Frosch states that the medication he received at the hospital made him groggy and that he thinks he had a concussion.[100] He "[does] not recall saying anything to Alsobrook that could have been interpreted as indicating an intent to kill or harm [himself]" while he was being transported back to the jail from the hospital.[101] Because of his grogginess, he "[does] not recall any details of the intake questions that were asked of [him]."[102] However, he has never wanted to kill himself, and did not want to kill or harm himself on the night in question.[103]

Frosch answered "no" when asked in his deposition if he had ever attempted suicide or been suicidal.[104] When asked, "have you ever told anyone that you were suicidal that you remember?" he said, "No, not that I can recall."[105] He also stated that he has never received any kind of mental health treatment or been diagnosed with paranoid schizophrenia.[106] Terrell State

---

[96] Doc. 82 at 6–7.
[97] Doc. 82-2 at ¶ 3.
[98] Doc. 82 at 22. Defendants do not point to any segment of the video that contains a suicidal comment.
[99] Doc. 82 at 24; Doc. 75-1 at 34.
[100] Doc. 82-2 at ¶ 10.
[101] Doc. 82-2 at ¶ 10.
[102] Doc. 82-2 at ¶ 11.
[103] Doc. 82-2 at ¶ 10–11.
[104] Doc. 87-1 at 3–4.
[105] Doc. 87-1 at 3–4.
[106] Doc. 87-1 at 4.

Hospital has no record of him being treated there.[107] A nurse at the jail completed a mental health questionnaire with Frosch two days after intake.[108] Frosch told the nurse that he had never attempted suicide and had not recently contemplated suicide.[109] He also stated that he had never been hospitalized for mental health issues.[110]

## LEGAL STANDARDS

### I.    Summary Judgment Standard

Summary judgment is proper when the pleadings and evidence show that "there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing there is no genuine dispute about any element essential to the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "material fact" is one that might affect the outcome of the suit under governing law. *Id.* Issues of material fact are "genuine" only if they require resolution by a trier of fact and if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports that party's claim. *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994). "Conclusory allegations unsupported by concrete and particular facts will not prevent an award of summary judgment." *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (citing *Anderson*, 447 U.S. at 247, 106 S. Ct. 2505).

---

[107] Doc. 82-10.
[108] Doc. 82 at 25; Doc. 82-3 at 9.
[109] Doc. 82 at 25; Doc. 82-3 at 9.
[110] Doc. 82 at 25; Doc. 82-3 at 9.

Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). In doing so, the nonmovant "cannot rely on the facts in its unverified complaint," it must instead "point to evidence in the record sufficient to establish the alleged facts[.]" *Solo Serve Corp. v. Westowne Assocs.*, 929 F.2d 160, 165 (5th Cir. 1991). Furthermore, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (quoting *Skotak v. Tenn. Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992)).

## II.    Qualified Immunity Standard

"A good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." *Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017). The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal. *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011). Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

"A public official is entitled to qualified immunity unless the plaintiff demonstrates that (1) the defendant violated the plaintiff's constitutional rights and (2) the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation." *Cowart v. Erwin*, 837 F.3d 444, 454 (5th Cir. 2016) (quoting *Waganfeald v. Gusman*, 674 F.3d 475, 483 (5th Cir. 2012)). To be clearly established, a right must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (internal quotations omitted). "The clearly established right must

be defined with specificity." *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019). To rebut the qualified immunity defense, the plaintiff must point to controlling precedent from the Supreme Court, the Fifth Circuit, or "a robust consensus of persuasive authority" that clearly establishes the violative nature of the particular conduct. *Morgan*, 659 F.3d at 371–72. Courts have discretion "in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

## ANALYSIS

The events giving rise to Frosch's claims occurred while he was a pretrial detainee at the Henderson County Jail. Under the Fourteenth Amendment, "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Frosch's constitutional rights as a pretrial detainee therefore "flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment." *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996).

Frosch brings claims under Section 1983 for violation of his Fourteenth Amendment rights based on Alsobrook's use of force in the jail and based on his placement in the violent cell.[111] Defendants move for summary judgment, arguing that: (1) Alsobrook's use of force was not objectively unreasonable; (2) Frosch's constitutional rights were not violated by being placed in the violent cell; (3) no defendant is subject to bystander liability based on Frosch's incarceration

---

[111] Doc. 30.

in the violent cell; (4) Alsobrook is not subject to supervisory liability; and (5) the individual officer defendants are each entitled to qualified immunity.[112]

## I.      Alsobrook's use of force

Count one of Frosch's complaint alleges that Alsobrook used force to such a degree that it constituted punishment of a pretrial detainee in violation of the Fourteenth Amendment.[113] Count three is also an excessive force claim against Alsobrook. It is brought in alternative to count one in case the Court finds that Frosch was a detained suspect at the time of the use of force instead of a pretrial detainee.[114] Alsobrook invokes qualified immunity in response, arguing that his use of force was not objectively unreasonable.[115] The Court must therefore determine: (1) whether Alsobrook violated Frosch's constitutional rights; and (2) whether Alsobrook's actions were objectively unreasonable in light of clearly established law at the time of the violation. *See Pearson*, 555 U.S. at 232.

### A.      Whether the Fourth or Fourteenth Amendment Applies

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 393–94 (1989). Frosch brings his excessive force claim under both the Fourth Amendment and the Fourteenth Amendment "in an abundance of caution."[116] Claims of excessive force during an arrest are analyzed under the Fourth Amendment. *Tyson v. Sabine*, 42 F.4th 508, 515 (5th Cir. 2022). On the other hand, where "the incidents of arrest have long since been completed and the pretrial detainee remains in detention, it is the Due

---

[112] Doc. 75 at 25.
[113] Doc. 30 at 19.
[114] Doc. 30 at 21.
[115] Doc. 75 at 27.
[116] Doc. 82 at 10.

Process Clause that provides the appropriate constitutional basis for determining whether a detention official's use of deliberate force on such a detainee is excessive." *Valencia v. Wiggins*, 981 F.2d 1440, 1449 (5th Cir. 1993).

"When alleged incidents of excessive force are based on events *prior to booking* the arrestee into a jail, they are covered by the Fourth, rather than the Fourteenth Amendment." *LeCompte v. Hendricks*, No. CV 22-1355, 2023 WL 4687963, at *5 (E.D. La. June 23, 2023), *report and recommendation adopted*, No. CV 22-1355, 2023 WL 4685387 (E.D. La. July 21, 2023); *see also Alanis v. City of Brownsville*, No. 1:16-CV-190, 2018 WL 11183788, at *6 (S.D. Tex. June 7, 2018), *report and recommendation adopted*, No. 1:16-CV-190, 2018 WL 11183821 (S.D. Tex. July 24, 2018) (noting that the "incidents of arrest" had not been completed because the book-in process had not been completed).

Here, the Fourth Amendment applies because Alsobrook's use of force occurred prior to Frosch's booking. However, this distinction is not particularly important because "[c]ourts have consistently applied the same objective-reasonableness standard to plaintiffs' excessive-force claims under the Fourth and Fourteenth Amendments." *Williams v. City of Houston, Texas*, No. CV H-16-3342, 2019 WL 2435854, at *8 n.1 (S.D. Tex. June 11, 2019) (compiling cases).

### B.    Whether Alsobrook's use of force was objectively reasonable

Excessive force that violates the Fourth Amendment requires showing: "(1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable." *Buchanan v. Gulfport Police Dep't*, 530 F. App'x 307, 312 (5th Cir. 2013) (quoting *Ikerd v. Blair*, 101 F.3d 430, 433-34 (5th Cir. 1996)). A Court must "adopt the perspective of a reasonable officer on the scene, rather than judge with [a] vision of hindsight." *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016) (quotation

omitted). The inquiry is "whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." *Id*.

Defendants do not contest that Frosch's broken collarbone and his head injury amount to a constitutionally cognizable injury. Defendants also do not contest that Alsobrook used force against Frosch. Defendants assert that Alsobrook's use of force was not "excessive" or "unreasonable." In the context of excessive force during arrest, the Supreme Court has identified the following factors to consider when applying the objective-reasonableness standard: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Additionally, the Supreme Court in *Kingsley* listed several factors courts may consider that are tailored to the objective-reasonableness standard in the jail context:

1. *"*the relationship between the need for the use of force and the amount of force used;"
2. "the extent of the plaintiff's injury;"
3. "any effort made by the officer to temper or to limit the amount of force;"
4. "the severity of the security problem at issue;"
5. "the threat reasonably perceived by the officer;" and
6. "whether the plaintiff was actively resisting."

*Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

Viewing the facts in the light most favorable to Frosch, there remains a genuine dispute of material fact regarding whether Alsobrook's conduct was objectively reasonable under the circumstances. The video evidence shows that Frosch was combative towards Henderson County Sheriff's Deputies during his arrest. The video evidence also shows that Frosch told a sheriff's deputy, "I'll kill you next time you come to my house without knocking" while seated in a patrol vehicle that was pulling up to the jail. Frosch does not dispute that the arresting officers gave jail

staff (including Alsobrook) a "rundown" of Frosch's behavior during his arrest and transport. This "rundown" goes towards the first and second *Graham* factors. Applying the first factor, Alsobrook was aware that Frosch had just assaulted sheriff's deputies, which is a serious crime. And as to the second *Graham* factor, Alsobrook's knowledge that Frosch had been physically combative during his arrest would reasonably cause Alsobrook to view Frosch as a potential threat to jail safety and security *before* they met.

However, the facts surrounding Frosch's conduct once at the jail (if viewed in the light most favorable to Frosch) are that—once the car door was opened—Frosch did not resist officers in any way and did not threaten to harm or kill anyone. Frosch was handcuffed at all relevant times and never attempted to headbutt or kick anyone at the jail. Frosch complied with Alsobrook's attempts to conduct a pat-down search and turned to face the wall when asked to do so. Despite Frosch's compliance with Alsobrook's directives, Alsobrook pressed Frosch face-first against a wall and twisted his arms above his head, at which point Frosch lost consciousness. When Frosch woke up, he learned that he had sustained a laceration to his head and that Alsobrook had used his body weight to "slam" Frosch to the floor, breaking his collarbone in the process.[117]

These facts go towards the third *Graham* factor (whether the suspect is resisting). "A suspect's active resistance is a key factor in the Fourth Amendment's 'objective reasonableness' test." *Curran v. Aleshire*, 800 F.3d 656, 661 (5th Cir. 2015) (citing *Graham v. Connor*, 490 U.S. 386 at 396 (1989)). "For an officer's force to be reasonable, it must be commensurate with the suspect's level of contemporaneous, active resistance." *Joseph v. Bartlett,* 981 F.3d 319, 335 (5th

---

[117] Although the Court must view the evidence in the light most favorable to the nonmoving party when deciding a motion for summary judgment, in instances where the facts are evident from "video recordings taken at the scene," the Court assigns these facts more weight. *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011). Defendants argue that the video recordings of Frosch's arrest "flatly contradict" Frosch's assertion that he became fully compliant with all directives once he encountered Alsobrook. Doc. 85 at 2. However, no video evidence exists of Frosch's encounter with Alsobrook. The only video evidence in the summary judgment record is of Frosch's arrest and transport to the jail, and the Court has fully considered the facts from these video recordings.

Cir. 2020). If Frosch was not actively resisting or making threats once he was removed from the patrol vehicle, Alsobrook inflicted force beyond what is permitted by the Fourth Amendment. This is the case regardless of whether Frosch had headbutted officers during his arrest or verbally threatened a sheriff's deputy in the patrol vehicle minutes before. *See Curran*, 800 F.3d at 661 ("It is not reasonable for officers to apply force to a suspect who is handcuffed in a patrol car en route to jail even though that suspect may have battered the officers minutes earlier during a traffic stop.").

Applying the *Kingsley* factors yields the same result. A great amount of force was used, and the force broke Frosch's clavicle and gave him a head wound requiring stitches. These are severe injuries (*Kingsley* factor two). Viewing the facts in the light most favorable to Frosch, at the point he encountered Alsobrook he was "fully compliant with all instructions and commands," handcuffed, unarmed, did not resist any jailers, and did not attempt to kick or head-butt any jailers. Therefore, the amount of force used did not match the severity of any security problem or the threat reasonably perceived by Alsobrook (*Kingsley* factors one, four, five, and six).

Alsobrook argues that, even if Frosch did not physically resist the officers and followed their commands to face the wall to be searched, the use of force was justified because Frosch was screaming threats that could potentially provoke other inmates to violence.[118] However, whether Frosch threatened to kill or harm anyone once at the jail is a disputed material fact—Frosch denies ever doing so.[119] In summary, factual disputes exist that are material to determining whether the force Alsobrook used was reasonably necessary. The same factual disputes are material to deciding whether Alsobrook is entitled to qualified immunity. Viewing the facts in the light most favorable to Frosch, Alsobrook "slammed" Frosch to the floor (breaking his collarbone and injuring his head)

---

[118] Doc. 75 at 30–31.
[119] Doc. 82-2 at 2.

when Frosch was fully compliant and was not making any threats. Accordingly, Frosch has sufficiently alleged that Alsobrook violated his Fourth Amendment rights.

### C.       Whether Alsobrook is entitled to qualified immunity for the use of force

The Court next considers the second prong of the qualified immunity analysis: whether Alsobrook's actions were objectively reasonable in light of clearly established law at the time of the conduct in question. Alsobrook is entitled to qualified immunity unless Frosch can identify binding precedent that "placed the statutory or constitutional question beyond debate," so that "every reasonable official would have understood that what he is doing violates that right." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (internal quotations and citations omitted). "[I]t is not necessary that 'the very action in question has previously been held unlawful.'" *Austin v. City of Pasadena, Tex.*, 74 F.4th 312, 326 (5th Cir. 2023) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). "Instead, there can be notable factual distinctions between the precedents relied on . . . so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Id.* (internal quotation marks and citation omitted).

"[Fifth Circuit] caselaw makes certain that once an arrestee stops resisting, the degree of force an officer can employ is reduced." *Cooper v. Brown*, 844 F.3d 517, 524 (5th Cir. 2016). Specifically, where an officer uses force that inflicts injury after a subject is "restrained and subdued," such force is unreasonable and excessive. *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008). Frosch cites several Fifth Circuit cases to support his assertion that it was clearly established at the time of the incident that Alsobrook could not forcefully tackle him when he was unarmed,

handcuffed, subdued, and not presenting an immediate threat.[120] The Court will examine those cases below.

In *Curran*, the allegations were that an officer slammed a high school student's head into a wall right after she struck him. *Curran v. Aleshire*, 800 F.3d at 658. Then—minutes later and after the student was handcuffed—he slammed the student's head into a wall a second time. *Id*. Because the district court concluded there was a factual dispute about the temporal proximity between the student's battery and the officer's two uses of force, the Fifth Circuit had "little difficulty" determining that the officer was not entitled to qualified immunity. *Id*. at 661. The Fifth Circuit noted that "[a] suspect's active resistance is a key factor in the Fourth Amendment's 'objective reasonableness test'" and that a reasonable officer should have realized that using force against a non-resisting plaintiff is an "obvious" case in which the *Graham* factors alone provide fair warning. *Id*. at 661–62.

Similarly, in *Bush v. Strain*, the Fifth Circuit held that an officer was not entitled to qualified immunity when he slammed the plaintiff's face into a nearby vehicle after the plaintiff was already restrained and subdued. *Bush*, 513 F.3d at 502.

In *Ramirez*, the officer immediately tased the plaintiff after the plaintiff refused to put his hands behind his back to be restrained and pulled his arm away from the officer's reach. *Ramirez v. Martinez*, 716 F.3d 369, 373 (5th Cir. 2013). The plaintiff was then forced face-down on the ground and handcuffed. *Id*. The officer tased the plaintiff again even though the plaintiff had stopped resisting. Id. at 372–73. The Fifth Circuit denied qualified immunity, reasoning that the plaintiff allegedly "posed no threat to the officers and yet was tased twice, including once after he

---

[120] Doc. 82 at 11–14.

was handcuffed and subdued while lying face down on the ground, in violation of clearly established law." *Id*. at 379.[121]

These cases—particularly *Curran*—illustrate that the right at issue was clearly established. Like the student in *Curran*, there is a fact issue as to whether Alsobrook's use of force happened after Frosch was handcuffed and subdued. Here, a temporal gap exists between Frosch resisting arrest, threatening a sheriff's deputy in the car ride, and coming into contact with Alsobrook. Furthermore, the Supreme Court has held that "in an obvious case," the *Graham* excessive-force factors themselves can "clearly establish" the answer. *Newman*, 703 F.3d at 763 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). Under Frosch's version of the facts, a reasonable jailer would know that forcefully tackling an unarmed, unresistant, and handcuffed pretrial detainee who presented no immediate threat violates clearly established law. Alsobrook is not entitled to qualified immunity at this juncture and his motion for summary judgment on Frosch's excessive-force claims should be denied.

## II.    Frosch's placement in the violent cell

Next, the Court will analyze Frosch's claims against Alsobrook, Mickey, Fain, and Johnson for his placement in the violent cell and his treatment during the two days he was housed there. Frosch claims that Alsobrook violated his constitutional rights because placed Frosch in the violent cell as punishment.[122] Frosch claims that Mickey, Fain, and Johnson violated his constitutional rights because they did not mitigate the unconstitutional conditions present in the violent cell during the two days Frosch was held there.[123] All four defendants move for summary judgment,

---

[121] Although this case involves a taser, the "lawfulness of force does not depend on the precise instrument used to apply it." *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012).

[122] Doc. 82 at 22.

[123] Doc. 82 at 29.

arguing: 1) Frosch's constitutional rights were not violated by being placed in the violent cell; and 2) they are entitled to qualified immunity even if Frosch's constitutional rights were violated.[124]

### A.    Conditions-of-confinement claim versus episodic-act-or-omission claim

As stated above, "[t]he constitutional rights of a pretrial detainee . . . flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment." *Hare*, 74 F.3d at 639 (citing *Bell*, 441 U.S. at 99). "The Fourteenth Amendment prohibits the imposition of conditions of confinement on pretrial detainees that constitute 'punishment.'" *Hamilton v. Lyons*, 74 F.3d 99, 103 (5th Cir. 1996) (citing *Bell*, 441 U.S. at 535). "Since the State *does* punish convicted prisoners, but *cannot* punish pretrial detainees, a pretrial detainee's due process rights are said to be 'at least as great as the Eighth Amendment protections available to a convicted prisoner.'" *Hare*, 74 F.3d at 639 (quoting *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

The Supreme Court in *Bell* reiterated the "distinction between punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may." *Bell*, 441 U.S. at 537. The Court explained the analysis involved in making that distinction as follows:

> A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees. Courts must be mindful that these inquiries spring from constitutional requirements and that judicial

---

[124] Doc. 75 at 31; Doc. 75 at 43.

answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.

*Id.* at 538–39 (internal citations omitted).

In the Fifth Circuit, two types of claims coexist to vindicate a pretrial detainee's rights: the conditions-of-confinement claim and the episodic-acts-or-omissions claim. *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999). The applicable standard to apply in analyzing the claim depends on its characterization under either theory. *Estate of Henson v. Wichita Cnty.*, 795 F.3d 456, 462 (5th Cir. 2015).

Conditions-of-confinement claims challenge the general conditions, practices, rules, or restrictions of pretrial confinement. *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc). For example, when a detainee complains about the number of bunks in his cell, his television, or his mail privileges, his claim is properly analyzed as an attack on conditions of confinement. *Id*. In contrast, an episodic-act-or-omission claim occurs "where the complained-of harm is a particular act or omission of one or more officials." *Id*. For example, a one-off event like a sexual assault by a jailer is an episodic-act-or-omission claim. *Id*.

In a conditions-of-confinement claim, a "plaintiff must show a condition—a rule, an identifiable intended condition or practice, or sufficiently extended or pervasive acts or omissions of jail officials—that is not reasonably related to a legitimate governmental objective and that caused the constitutional violation." *Sanchez v. Young Cnty.*, 956 F.3d 785, 791 (5th Cir. 2020) (per curiam) (citation and internal quotation marks omitted). A condition of confinement lacks a reasonable relationship to a legitimate governmental objective if it is "arbitrary or purposeless." *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 454 (5th Cir. 2009) (quoting *Bell*, 441 U.S. at 539). A plaintiff must prove that the condition constitutes a "serious [deficiency] in providing for his basic human needs" because "any lesser showing cannot prove punishment in violation of the detainee's

Due Process rights." *Id.* The Fifth Circuit has called this the "de minimis exception," and stated that it "provides a significant threshold to liability." *Duvall v. Dallas Cnty., Tex.*, 631 F.3d 203, 208 (5th Cir. 2011) (citing *Shepherd*, 591 F.3d at 454).

The Fifth Circuit has established "deliberate indifference" as "the measure of culpability for [claims properly characterized as] episodic acts or omissions." *Hare*, 74 F.3d at 643. In clarifying that the "deliberate indifference" standard applies to episodic-act claims, the Fifth Circuit noted that the use of a deliberate indifference standard does not "scale back the constitutional rights of pretrial detainees . . . because a proper application of *Bell's* reasonable-relationship test is functionally equivalent to a deliberate-indifference inquiry." *Id*. Liability for episodic acts or omissions cannot attach unless "the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk." *Id*. at 650. To establish deliberate indifference, a plaintiff must show (1) the defendant was aware of facts from which he could infer a substantial risk of serious harm existed, and (2) the defendant "actually drew that inference." *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020).

### B.    Liability for the central officer defendants

At the Henderson County Jail, the jailer assigned to the "central officer" position on any given shift is responsible for guarding inmates who are being housed in the violent cell. It is undisputed that each central officer defendant in this case (Mickey, Fain, and Johnson) was assigned to guard the violent cell at some point while Frosch was held inside.[125] Frosch seeks to hold the central officer defendants liable because they "refused to mitigate" the conditions inherent to the violent cell.[126] Specifically, Frosch asserts that the central officers violated his constitutional

---

[125] Johnson worked as the central officer on the night shifts of June 21 and June 22, 2021. Doc. 82 at 25; Doc. 82-8 at 3. Mickey worked the day shift of June 22, 2021. Doc. 82 at 25; Doc. 82-6 at 3. Fain worked the day shift of June 23, 2021. Doc. 82 at 25; Doc. 82-7 at 16.
[126] Doc. 82 at 29.

rights by not offering him bedding or the opportunity to leave his cell and take a shower, wash his hands, brush his teeth, or use a regular toilet.[127] Frosch also seeks to hold the central officer defendants liable for "the deprivations they directly caused," namely denying Frosch drinking water and refusing to turn off the lights at night.[128] Mickey, Fain, and Johnson move for summary judgment, arguing that: 1) the conditions of the violent cell did not violate Frosch's constitutional rights; and 2) they are entitled to qualified immunity even if Frosch's constitutional rights were violated.

Frosch does not clearly state whether he brings his claims against the individual officer defendants under an episodic-act theory or a conditions-of-confinement theory. Although both parties refer to the "conditions" of the violent cell throughout their briefing, Frosch's claim against the individual officer defendants is best categorized as an episodic-act claim because he complains of a particular act or omission on the part of each individual officer (*e.g.*, denying his requests for extra cups of water and failing to offer him bedding). *See Hare*, 74 F.3d at 645. Frosch's complaint emphasizes the deliberate indifference of each officer, stating "[e]ach of the Central Officer Defendants was well aware of the serious danger they were placing Frosch in when they intentionally subjected him to such treatment, yet they chose to subject him to it anyway, for approximately 48 consecutive hours."[129] Additionally, the Fifth Circuit has suggested that conditions-of-confinement claims brought against an individual may only be brought against that person in their official capacity. *E.g.*, *Est. of Allison v. Wansley*, 524 F. App'x 963, 970 n.4 (5th Cir. 2013); *see also Nagle v. Gusman*, 2016 WL 768588, at *5 (collecting cases).

---

[127] Doc. 82 at 28.
[128] Doc. 82 at 29.
[129] Doc. 30 at 20.

The central officer defendants should be granted summary judgment on Frosch's claim that they failed to "mitigate" the conditions of the violent cell. Frosch does not assert that any of the central officer defendants were responsible for the decision to place him in the violent cell, and they did not have the authority to independently release him from the violent cell.[130] Even viewing the summary judgment evidence in the light most favorable to Frosch, he has not raised a fact issue as to whether the central officer defendants knew he was being housed in the violent cell as punishment rather than as protection from suicidal tendencies.[131]

Additionally, liability for episodic acts or omissions cannot attach unless "the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk." *Hare*, 74 F.3d at 650. The key question is whether each of the central officers breached their constitutional duty to "tend to the basic needs of persons in [their] charge." *Id.* at 645. Frosch has not created a fact issue as to whether each central officer defendant breached their constitutional duty to tend to his basic needs.

First, Frosch alleges that the central officer defendants each denied him drinking water.[132] During Frosch's two days in the violent cell, he was given water at mealtimes.[133] This amounted

---

[130] Doc. 75 at 41; Doc. 75-6 at 7.
[131] The closest Frosch comes to creating a fact issue as to whether the central officer defendants knew Frosch was being housed in the violent cell as punishment rather than as protection from suicidal tendencies is Frosch's argument regarding the "observation form." Doc. 82 at 28. Jail policy states that suicidal inmates should be observed every ten to twenty minutes, and that these observations should be logged. Doc. 82-6 at 6; Doc. 82-8 at 10; Doc. 82-9 at 10. Frosch argues that the fact that no entries exist in his "observation form" after about 4 a.m. on the first night is evidence that the central officers knew he was being housed in the violent cell as punishment and not because he was suicidal. Doc. 82 at 28. However, Frosch also testified that the jailers walked by and checked on him every five minutes while he was housed in the violent cell. Doc. 100 at 1; Doc. 100-1 at 5–9. Defendants have explained why Frosch's "observation form" is blank after 4 a.m. on the first night. Suicidal inmates are often placed in the violent cell before their information has been entered into the jail's electronic booking system. Doc. 100 at 1; Doc. 100-2 at 5. Before their information is entered into the electronic booking system, central officers document their cell checks using handwritten entries on the "observation form." Doc. 100 at 1; Doc. 100-2 at 6. Frosch's observation form reflects that he was entered into the electronic booking system (also called "Guard-1") at about 4 a.m. Doc. 100-2 at 18. That is why no cell checks are recorded in his observation form after 4 a.m. Doc. 100 at 2.
[132] Doc. 82 at 29.
[133] Doc. 82-2 at ¶ 16.

to roughly 24 ounces of water per day.[134] He states each of the central officer defendants denied his other requests for water even though they had the discretion to provide him with extra cups of water upon request.[135] Frosch has provided no evidence that, assuming each central officer defendant knew Frosch was being provided only 24 ounces of water per day, the officers also knew that receiving that amount of water presented a substantial risk of serious harm to Frosch's health. Although Frosch notes that he felt "dehydrated," he points to no serious harm that came from only drinking 48 ounces of water over a two-day period—or that the officers were aware of that harm.[136]

Next, Frosch states that Defendant Johnson left the lights on all night during both nights that Frosch was housed in the violent cell.[137] Frosch has not established that Johnson had subjective knowledge of a serious risk of harm to Frosch that was caused by leaving the lights on. Johnson testified that he never turned the lights off in the violent cell because it creates a safety risk if it is too dark for him to properly observe an inmate with suicidal or violent tendencies.[138]

Frosch also claims that the central officer defendants violated his constitutional rights because they never offered him bedding or gave him the opportunity to take a shower, wash his hands, brush his teeth, and use a toilet while in the violent cell. [139] The Fifth Circuit has held that the deprivation of basic elements of hygiene (including bathroom facilities) may violate the Eighth

---

[134] Doc. 82 at 26; Doc. 82-2 at ¶ 16–18.
[135] Doc. 82 at 26; Doc. 82-2 at ¶ 16–18.
[136] Frosch cites to two district court cases to support his argument that the central officers were deliberately indifferent to his need for drinking water. In *Allen*, the court denied a motion to dismiss a prisoner's claim that he was confined to a "lockdown cell" with no running water for over two months. *Allen v. Holden*, No. CIV.A. 10-0753-JJB, 2011 WL 4737416, at *6 (M.D. La. Aug. 29, 2011), *report and recommendation adopted*, No. CIV.A. 10-753-JJB-DL, 2011 WL 4729831 (M.D. La. Oct. 5, 2011). In *Seal*, the court denied a request for summary judgment on a pretrial detainee's Fourteenth amendment claim when the detainee was only given an eight-ounce carton of milk to drink and one sip of water in a two-day period. *Seal v. Harrison Cnty., Miss. ex rel. Bd. of Sup'rs*, No. 1:08CV175-LG-RHW, 2010 WL 2545406, at *10 (S.D. Miss. June 18, 2010). Frosch's situation is not analogous, as he was given water with each meal amounting to at least 24 ounces per day.
[137] Doc. 82 at 26.
[138] Doc. 82-8 at 6.
[139] Doc. 82 at 28.

Amendment. *Palmer v. Johnson*, 193 F.3d 346, 352 (5th Cir. 1999).[140] Sleep also counts as one of life's basic needs, and conditions designed to prevent sleep may violate the Eighth Amendment. *Harper v. Showers*, 174 F.3d 716, 720 (5th Cir. 1999). Here, however, Frosch does not point to a substantial risk of serious harm that exists from being denied running water and bedding for two days.

There are compelling reasons why the central officers would not "mitigate" the conditions that Frosch complains of. Failure to provide pretrial detainees with adequate protection from their known suicidal impulses is a violation of their constitutional rights. *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 391 (5th Cir. 1992). The central officer defendants testified that the conditions of the violent cell were in place to protect suicidal inmates from self-harm. For instance, the lights of the violent cell are left on so that officers can quickly determine whether an inmate is harming themself.[141] Inmates are not given toothbrushes because they may swallow them.[142] There are no mattresses, pillows, toilets, or sinks because inmates could use those objects to harm themselves.[143] Even wet toilet paper can be used to make a rope that is dangerous in the hands of a suicidal inmate.[144]

A public official is entitled to qualified immunity unless the plaintiff demonstrates both that the defendant violated the plaintiff's constitutional rights and that the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation. *Cowart*,

---

[140] "The State owes the same duty under the Due Process Clause and the Eight Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm, during their confinement." *Hare*, 74 F.3d at 650. Eighth Amendment cases are therefore relevant to the Court's analysis. As discussed more fully below, the facts of *Palmer* can be distinguished from Frosch's case. In *Palmer*, scores of inmates confined to the same small area outdoors for one night were completely deprived of toilets. *Palmer*, 193 F.3d at 352. The Fifth Circuit found that these conditions constituted a deprivation of basic elements of hygiene in violation of the Eighth Amendment. *Id*. at 353.

[141] Doc. 75-4 at 10.

[142] Doc. 75-4 at 22.

[143] Doc. 75-4 at 30; Doc. 75-6 at 21.

[144] Doc. 75-4 at 33.

837 F.3d at 454. Frosch has not established that Defendants Mickey, Fain, or Johnson violated his constitutional rights. Qualified immunity therefore shields the central officer defendants from suit and summary judgment should be granted as to Frosch's claims against them.

### C.    Liability for Alsobrook

Frosch's claim for deprivation of basic human needs in violation of his Fourteenth Amendment rights is also brought against Alsobrook.[145] Alsobrook moves for summary judgment, arguing that: 1) he was not personally involved in placing Frosch in the violent cell; 2) Frosch was placed in the violent cell for his own protection; and 3) the conditions of the violent cell do not rise to a level of seriousness constituting a constitutional violation.[146] In response, Frosch asserts that Alsobrook was the jailer who decided that he should be placed in the violent cell and that, by placing him in the violent cell, Alsobrook intended to punish him.[147] Frosch further argues that the conditions of the violent cell deprived him of the "minimal civilized measure of life's necessities" in violation of his Fourteenth Amendment rights.[148]

### 1.    Alsobrook's involvement in Frosch's placement in the violent cell

Alsobrook argues that he had no personal involvement in Frosch's placement in the violent cell.[149] According to Alsobrook, it was predetermined prior to Frosch's arrival at the jail that Frosch would be placed in the violent cell because he had made suicidal comments to his arresting officers.[150] Alsobrook also states that once he returned from the hospital with Frosch he "removed himself from the situation" and left Frosch's intake up to other officers.[151]

---

[145] Doc. 30 at 19.
[146] Doc. 75 at 31–41.
[147] Doc. 82 at 20.
[148] Doc. 82 at 21.
[149] Doc. 75 at 41.
[150] Doc. 75-1 at 34.
[151] Doc. 75-1 at 36.

In response, Frosch points out that no suicidal comments can be heard in the extensive video recording of his arrest and transport to the jail.[152] Frosch denies ever making suicidal comments in the course of his arrest and transport to the jail.[153] As to Alsobrook's assertion that he "removed himself from the situation" and had no involvement in deciding to house Frosch in the violent cell, Frosch points to the text message Alsobrook sent his coworkers that read, "Well I know he was going there already but he's definitely going to have to be in violent. Just made suicidal comments."[154] This text message creates a fact issue as to whether Alsobrook was involved in Frosch's placement in the violent cell. According to Alsobrook, this text refers to the fact that the arresting deputies had already told him Frosch made suicidal comments during his arrest.[155] Frosch, on the other hand, points to the text message as evidence that Alsobrook made the decision to send Frosch to the violent cell before any alleged suicidal comments were made, and for some other reason.[156]

### 2.    Whether Frosch was placed in the violent cell for his own protection

Next, Alsobrook argues that Frosch was housed in the violent cell because he had threatened suicide many times.[157] Alsobrook testified that Frosch made suicidal comments during his arrest, at the jail, and when he was at the hospital.[158] In response, Frosch denies ever making suicidal comments.[159] Frosch admits that he cannot remember being asked questions about self-harm during his booking, but he states that he would not have made comments that he wanted to

---

[152] Doc. 82 at 16.
[153] Doc. 82 at 22; Doc. 82-2 at ¶ 3.
[154] Doc. 82 at 22; Doc. 82-12 at 2.
[155] Doc. 75-1 at 34.
[156] Doc. 82 at 22.
[157] Doc. 75 at 39.
[158] Doc. 75-1 at 33–38.
[159] Doc. 82 at 22.

harm himself because he has never wanted to harm himself.[160] He points out that the video of his transport to the jail contains no audible suicidal comments.[161]

Frosch also points to evidence that he argues indicates his mental health intake paperwork was falsified. First, the paperwork does not identify any suicidal comments made by him.[162] Regarding his suicidal comments, the form simply says, "won't say when; won't say how."[163] Additionally, although his intake paperwork says he was diagnosed with paranoid schizophrenia and received treatment at Terrell State Hospital, the custodian of records for Terrell State Hospital cannot locate any records showing he was treated there.[164] He notes that he told a nurse at the jail two days after intake that he had never attempted suicide, had not recently contemplated suicide, and had never been hospitalized for mental health issues.[165]

As summarized above, the Fourteenth Amendment prohibits Alsobrook from punishing Frosch, a pretrial detainee. The Supreme Court held in *Bell* that, "**absent a showing of an expressed intent to punish on the part of detention facility officials**, [the determination of whether a condition is imposed for the purpose of punishment] will turn on whether an alternative purpose to which [the condition] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." *Bell,* 441 U.S. at 538–539 (emphasis added). The *Bell* test is useful in many Fourteenth Amendment claims brought by pretrial detainees because it relieves the detainee from having to prove a subjective, expressed intent to punish. *Id.* Frosch asserts that here, however, there *is* evidence of Alsobrook's express intent to punish.[166]

---

[160] Doc. 82-2 at ¶ 10–11.
[161] Doc. 82 at 22.
[162] Doc. 82 at 23; Doc. 82-3 at 10.
[163] Doc. 82 at 23; Doc. 82-3 at 10.
[164] Doc. 82 at 23; Doc. 82-10 at 2.
[165] Doc. 82 at 24; Doc. 82-3 at 9.
[166] Doc. 107 at 1.

Specifically, Frosch points to the text message sent by Alsobrook to his coworkers on the way back from the hospital that states, "Well I know he was going there already but he's definitely going to have to be in violent. Just made suicidal comments."[167] As stated above, Frosch argues that this text message shows that Alsobrook made the decision to send Frosch to the violent cell, and that he made it before hearing any alleged suicidal comments.[168] Frosch also states that the fact that Alsobrook had previously broken Frosch's collarbone is evidence of intent to further punish Frosch.[169] When viewing this evidence in the light most favorable to Frosch, there is a fact issue as to whether Frosch was housed in the violent cell to protect him from suicide.

### 3.    Whether the conditions of the violent cell were de minimis restrictions

Alsobrook argues that the restrictions Frosch was subjected to in the violent cell did not deprive him of the "minimal civilized measure of life's necessities" and that they therefore did not rise to the level of a constitutional violation.[170] It is true that "the Constitution is not concerned with a de minimis level of imposition on pretrial detainees." *Collins v. Ainsworth*, 382 F.3d 529, 540 (5th Cir. 2004) (citing *Bell* 441 U.S. at 535).

*Hamilton*, a Fifth Circuit case, illustrates the principle that de minimis restrictions do not amount to punishment, no matter a jailer's intent. In *Hamilton*, a pretrial detainee was denied telephone access, recreation, mail, showers, and sheets for a three-day period. *Hamilton v. Lyons*, 74 F.3d 99, 106 (5th Cir. 1996). This Fifth Circuit affirmed the district court's decision to dismiss the detainee's § 1983 conditions of confinement claim. *Id*. Importantly, the Court stated: "[e]ven if Hamilton could show direct evidence that detention facility officials intended to punish him for crimes for which he had not yet been convicted, relief under § 1983 would not be warranted. *Bell*

---

[167] Doc. 82 at 22; Doc. 82-12 at 2.
[168] Doc. 82 at 22.
[169] Doc. 107 at 1.
[170] Doc. 75 at 35.

tells us that, for all pretrial detainees, '[t]here is, of course, a de minimis level of imposition with which the Constitution is not concerned.'" *Id*. (quoting *Bell*, 41 U.S. at 539 n.21). The Fifth Circuit has also held that pretrial detainees who were denied phone calls and mattresses for less than 24 hours were exposed to only a "de minimis level of imposition." *Collins v. Ainsworth*, 382 F.3d 529, 545 (5th Cir. 2004).

The District Court for the Northern District of Texas recently examined this issue in *Alexander v. S. Health Partners, Inc.*, No. 3:22-CV-0395, 2024 WL 3240652, at *1 (N.D. Tex. June 28, 2024). In that case Ronnie Alexander, a pretrial detainee, was held for five days in Henderson County's violent cell—the same type of cell Frosch was held in. *Id*. Alexander brought claims against Henderson County and several individual officers, arguing that the conditions he was subjected to in the violent cell violated his Fourteenth Amendment rights. *Id*. The conditions Alexander complained of are the same conditions Frosch complains of here. *See id.* (noting that the violent cell has no running water, no bedding apart from a suicide blanket, is constantly illuminated, etc.). The Court dismissed Alexander's claims against the individual officer defendants who guarded his cell and his claims against Henderson County, reasoning that the conditions of Henderson County's violent cell were reasonably related to the legitimate goal of preventing suicide and that, *even if they were not*, they still did not deprive Alexander of life's basic necessities. *Id*. at *4–5.

Other courts have held similarly. In *Williamson*, a pretrial detainee alleged that he was stripped of his clothing, placed in a smock, and put in a holding cell with four other inmates in what should have been a one-man cell. *Williamson v. Larpenter*, No. CV 19-254, 2019 WL 3719761, at *1 (E.D. La. July 15, 2019), *report and recommendation adopted*, No. CV 19-254, 2019 WL 3718135 (E.D. La. Aug. 7, 2019). He was kept there for "two or three days." *Id*. The cell

was "dirty, with food trays all around," and it was also overcrowded and cold. *Id*. The cell had a toilet and sink, but no mattress. *Id*. The court dismissed his claim, noting that "[t]hese conditions, while plainly not comfortable or pleasant, do not rise to a level of seriousness constituting a constitutional violation." *Id*. at *9.

In *Chapman*, a pretrial detainee brought a conditions-of-confinement claim based on his placement in a suicide prevention cell for sixteen days. *Chapman v. Proctor*, No. 2:20-CV-91, 2022 WL 822466, at *1 (S.D. Ga. Jan. 10, 2022), *report and recommendation adopted*, No. 2:20-CV-91, 2022 WL 501390 (S.D. Ga. Feb. 18, 2022). The plaintiff alleged—just as Frosch does—that he was placed in the suicide cell even though he was not suicidal. *Id*. He stated that during his sixteen-day confinement in the cell, he did not have a bed, toilet, sink, clothing, toiletries, utensils, or adequate heat. *Id*. at *6. His cell had a grate which was supposed to function as a toilet, but the plaintiff stated he was unable to use it. *Id*. Unlike Frosch, he was permitted to leave his cell to shower, use the restroom, or exercise for a certain period each day. *Id*. The court recommended dismissal of his Fourteenth Amendment claim because the conditions "fail[ed] to demonstrate any deprivation of the minimal civilized measure of life's necessities." *Id*. at *7.

Frosch asserts that the conditions of the violent cell constituted serious deficiencies in providing for his basic human needs and cites several Fifth Circuit cases that he argues support this finding. However, the cases Frosch cites can be distinguished from the facts at hand. First, Frosch complains that the conditions of his confinement, in combination, deprived him of the basic elements of hygiene.[171] He asserts that the suicide cell reeks of urine and feces and "every surface

---

[171] Doc. 82 at 19. Conditions of confinement may be unlawful when, in combination, "they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004).

is sticky and stained."[172] Additionally, he explains that he had no running water and had to eat with his hands.[173]

The deprivation of basic elements of hygiene (including bathroom facilities) may violate the Eighth Amendment. *Palmer*, 193 F.3d 346, 352 (5th Cir. 1999). For example, in the Fifth Circuit case *Palmer*, the plaintiff was denied access to any bathroom facilities for 17 hours while forced to spend the night outside in extremely cold weather. *Id*. at 352. He and 48 other inmates had to relieve themselves in a confined area. *Id*. The Fifth Circuit held that these circumstances "constituted a denial of the minimal civilized measure of life's necessities." *Id*. at 354.

In *Taylor*, the Fifth Circuit likewise found that denying inmates "a minimally sanitary way to relieve themselves" may deprive them the minimal civilized measure of life's necessities. *Taylor v. Stevens*, 946 F.3d 211 (5th Cir. 2019), *aff'd in part and vacated on other grounds, sub nom., Taylor v. Riojas,* 592 U.S. 7 (2020). In *Taylor*, the plaintiff brought a § 1983 claim challenging his conditions of confinement during his six-day stay in two filthy cells. *Id* at 218–19. The first cell's entire surface was covered with massive amounts of feces and emitted a strong odor. *Id*. Taylor had to sleep in it naked. *Id*. He could not drink water because feces were "packed inside the water faucet." *Id*. The second cell was very cold and had no water fountain, no bunk, and no toilet. *Id*. There was a drain in the floor where Taylor was ordered to urinate, but the drain was already overflowing with sewage. *Id*.

Frosch's deprivation here was different. Frosch had a grate in the floor of his private cell that he used to relieve himself. Although he asserts that his cell reeked of urine and feces, he does not claim that it was laden with fecal matter like the cell in *Taylor*. Additionally, the Supreme Court has noted that "the length of confinement cannot be ignored . . . [a] filthy, overcrowded cell

---

[172] Doc. 82-2 at 4.
[173] Doc. 82 at 20–21.

. . . might be tolerable for a few days and intolerably cruel for weeks or months." *Hutto v. Finney*, 437 U.S. 678, 687, 98 S. Ct. 2565, 2571, 57 L. Ed. 2d 522 (1978). Although his conditions were not ideal, they were brief and do not rise to the level of a constitutional violation.

Second, Frosch asserts that the conditions of his confinement had the mutually enforcing effect of depriving him of sleep.[174] The Fifth Circuit has held that sleep undoubtedly counts as one of life's basic needs, and that conditions designed to prevent sleep may violate the Eighth Amendment. *Harper v. Showers*, 174 F.3d 716, 720 (5th Cir. 1999). Frosch points to the fact that he was only provided with a thin blanket and was forced to sleep on a concrete slab built into the wall.[175] He states that bright lights were left on in the cell at all hours. Frosch once again cites to *Palmer* for the proposition that deprivation of bedding for two days rises to the level of a constitutional violation.[176] But Palmer's claim was that "he was forced to withstand strong winds and cold without the protection afforded by jackets or blankets." *Palmer*, 193 F.3d at 346. And Palmer alleged that "he and the other inmates were reduced to digging in the dirt to construct loose earthen walls as feeble wind barriers while their guards warmed themselves with jackets, a fire, and car heaters." *Id*. Frosch, in comparison, had a blanket and a padded concrete bench to sleep on. Although not comfortable, two nights of these conditions do not rise to the level of a constitutional violation.

In summary, Frosch was exposed to de minimis restrictions that do not rise to the level of a constitutional violation. This is particularly the case because Frosch does not establish a direct, serious harm or a risk of harm as a result of the restrictions of the violent cell.[177] A public official

---

[174] Doc. 82 at 19.

[175] Doc. 82 at 21; Doc. 82-2 at ¶15.

[176] Doc. 82 at 19.

[177] Frosch asserts that the violent cell "has the effect of a psychological torture chamber," and that "the experience was one of the worst of [his] life." Doc. 82 at 6. He states he was dehydrated and sleep deprived after being housed there for two nights. Doc. 82-2 at ¶ 22. However, given that Frosch was housed there for only two nights, the Court cannot say this constitutes a serious risk of physical harm.

is entitled to qualified immunity unless the plaintiff demonstrates both that the defendant violated the plaintiff's constitutional rights and that the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation. *Cowart*, 837 F.3d at 454. Because Frosch has not established that Alsobrook violated his constitutional rights, Alsobrook is entitled to qualified immunity. Summary judgment should be granted as to Frosch's claim against him for deprivation of basic human needs.

## RECOMMENDATION

Based on the foregoing, the Court **RECOMMENDS** Defendants' Motion for Summary Judgment on Qualified Immunity (Doc. 75) be **GRANTED in part and DENIED in part**. Summary judgment should be denied as to Frosch's claim against Alsobrook for use of force. Summary judgment should be granted as to claims against Mickey, Fain, Johnson, and Alsobrook for deprivation of basic human needs.

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C). To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Servs. Auto. Ass'n*,

79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C.

§ 636(b)(1) (extending the time to file objections from ten to fourteen days).

So ORDERED and SIGNED this 29th day of July, 2024.

K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE